IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LOMAX SALTER,
     Petitioner,

v.                             Case No.  3:04cv426/MCR/MD

JAMES V. CROSBY, JR.,
     Respondent.

_____

## REPORT AND RECOMMENDATION

     **Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  (Doc. 1).  Respondent filed an answer, submitting relevant portions of the state court record.  (Doc. 9).  Petitioner has filed a reply.  (Doc. 11).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.**

## BACKGROUND[1]

     **On December 23, 1997 Rick Carnley left his house around 5:00 a.m. and drove down Whirlpool Road in northern Escambia County.  (Doc. 9, Ex. E, p. 234).[2]  While driving down Whirlpool Road, he noticed a small fire.  (*Id.*, p. 236).  Two to three**

---

[1]The facts stated herein are a greatly compacted version of those presented at trial.  The facts are viewed in the light most favorable to the prosecution.  Where there are conflicting inferences and disputes exist, this court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution.  *Martin v. State of Alabama*, 730 F.2d 721,724 (11th Cir. 1984).

[2]Hereafter all references to exhibits will be to those provided at Doc. 9 unless otherwise noted.

hours later William Andrews, who worked for a logging company in that area, saw the same fire while driving down Whirlpool. (*Ex. D*, pp. 184-85). As he approached the fire he realized that it was a human body on fire. Andrews called the sheriff's department and threw dirt on the fire in an attempt to put out the flames. (*Id.*, pp. 186-87).

Deputy Frank Way investigated the call. (*Id.*, pp. 170-71). He arrived at 8:18 a.m. (*Id.*, p. 178). The body, in a ditch, was still smoking when he arrived. (*Id.*, p. 172). Way noted vehicle tracks and an area where someone had tried to obscure the tracks with a "blunt-nose shovel." (*Id.*, pp. 173-74). Other deputies responded to the scene. Detective David Carroll smelled what he believed to be an odor of gasoline on the body. (*Ex. E*, p. 201). He also found a yellow piece of paper near the body. The paper had an address written on it. (*Id.*, pp. 204-05). Deputy Dan Henry testified that when he got close to the body he, too, detected a strong gasoline odor coming from the body. (*Id.*, p. 327). There were tire tracks leading to and from the body. (*Id.*). The yellow note found near the body had the address of "3645 14th Avenue South" written on it. (*Id.*, pp. 328-29). A nationwide check came up with four possibilities, one of them in St. Petersburg, Florida. (*Id.*, p. 329).

Just prior to 4:00 a.m. on the day the body was found, Charles Smith, the night manager at a nearby Wal-Mart, was standing outside the store. He saw a van pull up, drive past empty parking spaces near the front of the store, and park in the back of the parking lot, much farther from the front of the store than necessary. (*Id.*, pp. 241-42). A black male and a white female exited the van and walked into the store. The black male asked Smith where the shovels were. Smith later saw the couple checking out with a shovel and a red gas can. (*Id.*, pp. 242-44). Hilda Huffman, a Wal-Mart employee, heard the woman say to the man, "now we're obligated" or words to that effect. (*Id.*, pp. 261-62). She identified petitioner in open court as the person to whom this remark was made. (*Id.*, p. 262). Teresa Wilson, a Wal-Mart clerk, took the woman to the garden department. The woman picked out a square ended shovel, but wanted a pointed tip one. The woman stated that if it wasn't what they wanted, she would leave it at the register. (*Id.*, p. 275). Lisa Grimes was a Wal-

Mart cashier at the time.  She also identified petitioner in open court.  (*Id.*, pp. 278-79).  She was the cashier who rang out petitioner and the woman for the shovel and gas can.  The woman told petitioner that "she wanted him to come on, hurry up, let's go get this over with."  (*Id.*, pp. 279-82).  After reading a newspaper story about the crime, Grimes called police.  (*Id.*, pp. 283-84).  The black male and white female exited the store and re-entered the van.  No one else was seen around the van or getting into or out of the van.  (*Id.*, pp. 291-92).  Still photos from the Wal-Mart surveillance video camera were entered into evidence.  (*Id.*, pp. 305-06).

Further investigation led to a Nugget Oil gasoline station.  Steven Rollo was the night manager of the station in December of 1997.  (*Id.*, p. 307).  One morning Rollo observed a black male pump gas into a red gas can.  A white female went inside the station and paid for the gas.  (*Id.*, pp. 307-09).  A store receipt for the morning of December 23, 1997 showing the purchase was admitted into evidence, as were photographs from the video tape.  The video tape was played as well.  (*Id.*, pp. 310-312).

Still photographs from the Wal-Mart video were publicized to get an identification of the man and woman seen on them.  (*Id.*, pp. 329-30).  John Bates, a deputy sheriff, recognized the man as his ex-brother-in-law, Lomax Salter.  (*Id.*, p. 331).  Detectives Dan Henry and Ricky Shelby spoke to petitioner's ex-wife, who advised them petitioner was living in St. Petersburg.  (*Id.*).  At that time, the detectives were able to get a possible first name of the white female who was with petitioner, the name being Lydia.  (*Id.*, p. 332).  After more research the detectives were able to come up with a current address and possible last name on Lydia.  The possible last name was Rosario.  (*Id.*).

Henry and Shelby traveled to St. Petersburg and met with Detective Deasaro with the St. Petersburg Police Department .  The three went to the address found on the note near the body.  (*Id.*, p. 333).  A woman there knew petitioner vaguely.  (*Id.* p. 334).  She indicated petitioner lived approximately a mile away.  (*Id.*).

The next day, Detectives Henry and Shelby went to petitioner's home.  Petitioner answered the door, stated that Lomax Salter wasn't there, and furnished

a false name.  (*Id.*, pp. 336-37).  Petitioner later admitted he was Lomax Salter and accompanied the detectives to the St. Petersburg Police Department for an interview.  (*Id.*, p. 337).  During the interview, petitioner indicated  he knew Lydia Rosario and that their relationship was "strictly employment."  (*Id.*, pp. 339-40).  He admitted being in Pensacola just before Christmas and to buying a shovel and gas can at the Wal-Mart.  (*Id.*, pp. 340-41).

Later, the detectives located Lydia Rosario driving a 1994 or 1995 Ford Van, which appeared to be the same van as in the Nugget Oil videotape.  The van bore a tag registered to Louis Saulnier.  (*Id.*, pp. 347-48).

The detectives went to Saulnier's home where they found a telephone caller I.D. unit with a number which corresponded to petitioner's ministry Breaking Point Ministries.  (*Id.*, p. 350).  Officers also found Saulnier's bank records indicating his account was overdrawn.   Also found at Saulnier's home was "a last will and testament kit," a durable power of attorney, and a residential lease, the notary for which was petitioner.  The execution date of the power of attorney was December 22, 1997.  (*Id.*, pp. 351, 354-58).  The person named as being the tenant in the lease, and as holding Mr. Saulnier's power of attorney, was Lydia Rosario.  (Ex. G, pp. 611, 612, 788).  Also found at Saulnier's home were additional blank durable power of attorney forms which petitioner had notarized.  (Ex. E, pp. 356-58).

After checking Saulnier's home, the detectives attempted to identify the burned body by showing the photographs of the body to Troy Saulnier, Louis Saulnier's nephew and a deputy with the Hillsborough County Sheriff's Department.  Troy Saulnier identified the burned body as that of his uncle, Louis Saulnier.  (*Id.*, p. 352).

The pathologist could not ascertain an exact cause of death; however, he was of the opinion that it was a homicide because he could find no natural cause of death. (Ex. F, p. 429).  The pathologist was of the opinion that the victim was dead before being set on fire.  (*Id.*, p. 430).

An official of Louis Saulnier's bank testified that its records showed that on average, Saulnier's checking, savings, and certificate of deposit accounts averaged

a total of $40,000 up through November of 1997.  (*Id.*, p. 523).  On November 18, 1997, a $15,000 check was drawn.  (*Id.*, pp. 523-24).  On December 30, 1997, Lydia Rosario withdrew $10,000 from Saulnier's savings account using a power of attorney.  (*Id.*, p. 524).  The power of attorney was dated December 30, 1997 and notarized by petitioner.  (*Id.*, p. 525).  From December 30, 1997 to January 6, 1998, Lydia Rosario withdrew $14,989.94 out of Saulnier's accounts.  (*Id.*, p. 529).  Bank videotapes were also introduced into evidence. (*Id.*, pp. 531-32).

A relative of Louis Saulnier found a receipt from one of Saulnier's checks which was dated December 22, 1997 and made out to Breaking Point Ministries for $1,385.  (*Id.*, p. 538).  Louis Saulnier's sister testified that it was greatly out of character for Saulnier to contribute to religious organizations.  In fact, Saulnier left his late wife for a year because she "had been involved in religious television, and he wasn't happy."  (*Id.*, pp. 473-74).

Lydia Rosario (petitioner's co-defendant) applied to a social services agency for rent help in December of 1997.  (*Id.*, p. 591).  On one of the forms, she listed her address as Breaking Point Ministries located at 3620 18th Avenue South, indicating that that had been her address since January 6, 1997.  The form was signed by Reverend L.M. Salter, who gave the same address as his own.  (*Id.*, p. 592).  The same social services agency received a request for rent help from petitioner in November and December of 1997.  To be eligible, petitioner had to sign a form stating he had no income and no assets.  (*Id.*, p. 593).

A handwriting examiner testified that the address found on the note at the crime scene "was probably written by Mr. Salter."  (Ex. G, pp. 624-25).

Police obtained an additional statement from petitioner, part of which was recorded.  In the unrecorded portion of the statement, petitioner told police, among other things, that he was "holding" some $10,000 from a $20,000 "settlement" Rosario had received, and that he "still owed her some $6,000 from that money he had been holding for her."  (*Id.*, p. 658).  Petitioner also admitted getting cash from Lydia Rosario.  (*Id.*, p. 663).  Police found on petitioner two new, fresh $50 bills. When Lydia Rosario was investigated by police, she had "several thousand dollars'

worth in 50s" with virtually sequential serial numbers.  (*Id.*, pp. 663-64).  The recorded portion of petitioner's statement was played for the jury.  (*Id.*, pp. 727, 790).  In that statement, petitioner admitted being at the scene where Saulnier was killed and burned, admitted notarizing documents purportedly signed by Saulnier for the benefit of Rosario after Saulnier's death, admitted being the man in the video at Wal-Mart and Nugget Oil, but denied personal culpability in the death of Saulnier, claiming that Lydia Rosario and two Hispanic males named Glenn and "Dwayne or Wayne" were responsible.  (*Id.*).

After Louis Saulnier disappeared, his relatives went searching for a gray Ford car of his that was missing, believing it to be stolen.  (Ex. F, pp. 490-91).  They later found it in a St. Petersburg store parking lot with a "For Sale" sign listing a telephone number of 804-1253.  (*Id.*, p. 492).  Police found in petitioner's wallet a piece of paper with the writing "L.D., then 804-1253."  (Ex. G, p. 685).

## PROCEDURAL HISTORY

On January 21, 2000 petitioner was found guilty by jury verdict of first degree premeditated felony murder (Count 1), kidnaping (Count 2), and robbery (Count 3), in the Circuit Court of Escambia County, Florida, case number 98-325.  (Doc. 9, Ex. A, pp. 407-14).  This was petitioner's second trial, his first trial having ended in a mistrial.  (*See* www.clerk.co.escambia.fl.us, case number 98-325, docket entry of 6/11/99).  Petitioner was sentenced to concurrent terms of life imprisonment on Count 1, twenty years imprisonment on Count 2 and fifteen years imprisonment on Count 3.  (Ex. A, pp. 407-14).  On appeal, petitioner's appellate counsel filed an *Anders*[3] brief.  (Exs. M & O).  Although petitioner sought and was granted permission to file his own *pro se* initial brief, (Ex. Q), he ultimately filed a notice stating that he declined to file a brief.  (Ex. T).  The Florida First District Court of Appeal ("First DCA") affirmed petitioner's convictions and sentences on July 5, 2002, without written opinion.  *Salter v. State*, 826 So.2d 290 (Fla. 1st Dist. Ct. App. 2002) (Table).

---

[3]*Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

On January 29, 2003 petitioner filed a motion for post-conviction relief pursuant to FLA.R.CRIM.P. 3.850. (Ex. Y, pp. 1-26). He raised a single claim--that his trial counsel rendered ineffective assistance in three respects. The Rule 3.850 court denied relief in an order dated November 12, 2003. (*Id.*, pp. 27-29). The denial order was affirmed by the First DCA without written opinion on March 29, 2004, *Salter v. State*, 871 So.2d 214 (Fla. 1st DCA 2004) (Table), with the mandate issuing April 26, 2004. (Ex. CC).

Petitioner filed the instant federal habeas petition on November 29, 2004. He raises one claim--the ineffective assistance claim he presented in his motion for post-conviction relief.

## DISCUSSION

Standard of Review

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523 (O'Connor, J., concurring).  Under the test just described a habeas court does not examine the State court's ruling to see if it is correct, but examines it only to see if it is reasonable.  More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Id.*, 123 S.Ct. 1172.   The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  *Neelley v.* Nagle, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and

nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer,* 123 S.Ct. at 1173 (quoting *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. at 1519-20).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  *Holland v. Jackson*, --- U.S. ---, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a

context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*, 529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims. *Neelley*, 138 F.3d 917. Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court); *Jackson*, 112 F.3d at 824-25 (noting that the new statute places a heavier burden on petitioner to overcome the presumption of factual correctness).

Petitioner's Claim

Petitioner claims he was denied effective assistance of trial counsel based on counsel's failure to "properly" object to the State's use of Witness Twanna Banning's prior trial testimony, counsel's failure to move for judgment of acquittal at the close of the evidence, and counsel's failure to call Rene Wilson as a witness. The Rule 3.850 court denied relief, finding each ground to be without merit.

1.    Clearly Established Federal Law

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance." *Chandler*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*). In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance. *Chandler* at 1314. "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*, 513 U.S. 899, 115 S.Ct. 255, 130 L.Ed.2d 175 (1994). In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting

effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance." *Waters* [*v. Thomas*, 46 F.3d 1506], 1522 (en banc). Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.

*Chandler* at 1314 (footnote omitted). Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment. *Chandler* at 1314 n.15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. at 2068. Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

2.      **Review of State Court Decision**

   a.      <u>Failure to "properly" object to the State's use of Witness Twanna
   Banning's prior trial testimony</u>

During the defense case, two witnesses testified concerning statements co-
defendant Lydia Rosario made to them which related details of the crimes.  Kelly
Ostroski testified that Rosario told her two Mexican males took the trip with Rosario
and petitioner to Pensacola; that the victim Louis Saulnier was afraid of Rosario; and
that petitioner was not present when the two Mexicans were "involved" with the
victim.  (Ex. H, pp. 860-63).   Ms. Ostroski also testified that Rosario told her
petitioner was not involved with the plan to kill Mr. Saulnier, he (petitioner) just
notarized the power of attorney.  (*Id.*, p. 869).  Meghan Hartrick testified through the
reading of her previous trial testimony that co-defendnat Rosario told her if people
hadn't come down the road, petitioner would have been killed.  Hartrick also testified
that Rosario did not say anything indicating petitioner was involved in the planning
or commission of the Saulnier murder.  (*Id.*, p. 884).

After the defense rested, the State in rebuttal read the prior trial testimony of
Twanna Banning concerning statements Rosario made to her while at the Escambia
County Jail.   Banning testified that Rosario told her there was a plan to kill
petitioner, but it was only so that Rosario would not have to split the money with
him. (Ex. I, pp. 1080-81).  Banning further testified that, in terms of discussing the
murder of Saulnier, Rosario always referred to "we," referring to petitioner.  (*Id.*, p.
1081).   Additionally, Rosario told Banning that she and petitioner purchased
handcuffs and a stun gun which they used to immobilize Saulnier; that the only
people in the van at the time of the murder were Rosario, Saulnier and petitioner;
that "they" had planned the murder in advance for some length of time; that the
motive was to get Saulnier's money; and that the use of the stun gun and handcuffs
occurred in the van.  (*Id.*, pp. 1082-84).

Petitioner faults trial counsel for failing to "properly" object to the State's use
of the Banning testimony. Petitioner concedes trial counsel objected on the grounds
of improper rebuttal; however, petitioner argues counsel erred because that was not
the proper objection.  According to petitioner, trial counsel should have objected on

the following grounds: (1) the statements of co-defendnat Rosario to which Banning testified did not qualify as prior inconsistent statements because they were not contrary to Rosario's prior statements, (2) the statements of co-defendnat Rosario to which Banning testified were not statements against penal interest because "it would comport with the law," (3) the Banning testimony was inadmissible because co-defendant Rosario pleaded the Fifth Amendment and therefore she could not be cross-examined, and (4) the Banning testimony was inadmissible double hearsay. Petitioner maintains that counsel's failure to object on these bases "allowed double hearsay testimony to be presented to the trier of the facts, without any rebuttal or cross-examination." (Doc. 1, p. 4-3).

The Rule 3.850 court denied relief finding, in relevant part, as follows:

> Defendant's first asserted claim for relief is that his counsel was ineffective for permitting the prior testimony of a witness from Defendant's first trial to be read to the jury as rebuttal by the State. Defendant contends such testimony was double hearsay and not an exception to the hearsay rules under Section 90.804(2)(a), Fla. Stat. Defendant contends counsel should have kept such evidence from being presented to the jury.

> The record reflects that counsel objected to the reading of Twanna Banning's prior testimony to the jury. The Court overruled the objection. Defendant fails to explain how counsel could have kept the testimony from being read to the jury in the face of an unsuccessful objection.

(Ex. Y, pp. 27-28) (footnote omitted). The Rule 3.850 court's findings are presumed correct, and are amply supported by the record.

At the close of the defense case, the State identified its rebuttal witnesses, including Twanna Banning. (Ex. I, p. 1036). Defense counsel objected to the Banning testimony, arguing it was not proper rebuttal in that it did not rebut any defense witness' testimony. (Id.). The State argued that the testimony was proper rebuttal because the statements Rosario made to Banning told "a different story" than the statements Rosario made to the defense witnesses. (Id., pp. 1036-37). The trial court overruled the defense objection. (Id., p. 1037). When the State began to read the Banning testimony, defense counsel renewed his objection and the court again overruled it. (Id., p. 1078). At a bench conference, defense counsel clarified

that his objection was that the testimony was not proper rebuttal. (*Id.*). The court reiterated that the objection was overruled, noting "[i]t comes in principally as a -- as a prior inconsistent statement to the other statements attributed to Lydia Rosario." (*Id.*). Defense counsel argued in opposition that if that was the case, the court should limit the Banning testimony to only those statements which contradicted the prior statements attributed to Rosario. (*Id.*). In response the State explained that Rosario's statements, as related by Twanna Banning, were admissible as "statement[s] against penal interest," an exception to the hearsay rule. (*Id.*, pp. 1078-79). The trial court ruled that the statements had "dual functions," but that they principally constituted rebuttal because they were offered as prior inconsistent statements. (*Id.*, p. 1079).[4]

The gravamen of petitioner's claim is that the Banning testimony constituted inadmissible hearsay; that counsel failed to object on that basis; and that had counsel objected the testimony would have been excluded and petitioner would have been acquitted. However, the trial transcript conclusively demonstrates that trial counsel's objection and corresponding argument encompassed the hearsay issue, as did the trial court's evidentiary ruling.[5] Thus, petitioner's contention that counsel failed to attempt to exclude or limit the Banning testimony on hearsay grounds is refuted by the record.[6] The Rule 3.850 court did not unreasonably apply

---

[4]Florida Rule of Evidence 90.806 provides, in pertinent part, as follows:

**Attacking and supporting credibility of declarant**
   (1) When a hearsay statement has been admitted in evidence, credibility of the declarant may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time inconsistent with the declarant's hearsay statement is admissible, regardless of whether or not the declarant has been afforded an opportunity to deny or explain it.

Fla. Stat. § 90.806; *see also* Fla.Stat. §§ 90.608 and 90.614.

[5]To the extent petitioner argues the trial court's ruling was error because the hearsay statements contained in the Banning testimony did not qualify as prior inconsistent statements or statements against penal interest, such a claim is procedurally defaulted because petitioner failed to pursue it on direct appeal.

[6]Moreover, in light of the portions of the trial transcript just discussed, petitioner's allegations fail to establish a reasonable probability that had counsel further pursued a hearsay objection on the specific points raised by petitioner, the trial court would have excluded the Banning testimony on

the *Strickland* standard when it concluded that petitioner's allegations fail to establish deficient performance with regard to the Banning testimony.

> b.   Failure to move for judgment of acquittal at the close of the evidence

Petitioner next claims that his trial counsel rendered ineffective assistance because he failed to move for judgment of acquittal at the close of evidence. Petitioner argues that counsel knew the State had not proven by direct evidence the elements of the crimes with which he was charged; therefore, he should have filed a motion for judgment of acquittal which included argument on the circumstantial evidence rule.

The Rule 3.850 court denied relief, finding as follows:

> The record reflects that counsel did, in fact, renew his motion for judgment of acquittal after resting Defendant's case. Counsel renewed his motion on identical grounds stated at the close of the State's case, which were detailed, specific and legally sufficient.   Counsel specifically noted the different standard of review for this motion for judgment of acquittal, and the Court denied the motion.  Therefore, Defendant's claim is without merit.

(Ex. Y, p. 28) (footnotes omitted).  The state court's findings are presumed correct, and are amply supported by the record.  The trial transcript reveals that defense counsel moved for judgment of acquittal at the close of the State's case in chief. (Ex., H, p. 818).  He then renewed the motion after resting the defense's case, (Ex. I, p. 1074), and again at the close of all the evidence, (Ex. J, p. 1274).  Because the record conclusively refutes petitioner's allegations of error on the part of trial counsel, the state court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard.

> c.   Failure to call Rene Wilson as a defense witness

Petitioner asserts that prior to trial he advised counsel that counsel needed to contact Rene Wilson, the secretary of petitioner's ministry.   According to petitioner, Ms. Wilson witnessed the power of attorney and the residential lease prepared by petitioner and signed by Mr. Saulnier. Petitioner states Ms. Wilson was available and would have testified that at no time in her presence was there a sign

of use of force during the recording or signing of the legal instruments, nor was there any sign of sedation or drug use at the time of the recording. Additionally, Ms. Wilson would have testified that during her witnessing of the documents, she overheard that the victim was planning a trip to Michigan but had to stop in Pensacola to pick up his friend Dwayne's car, and also overheard the victim invite petitioner to accompany him on the trip because the victim was concerned about co-defendant Rosario driving back alone from Pensacola to St. Petersburg. Petitioner contends he was prejudiced by counsel's failure to investigate and call Ms. Wilson as a witness because there is a reasonable probability that her testimony would have cast doubt in the jury's mind concerning his guilt.

The Rule 3.850 court denied relief, finding as follows:

> Defendant's claim cannot be reconciled with the record. Defendant testified under oath at trial that the documents were witnessed by William Capa and Roger Williams, not by Ms. Wilson. Mr. Williams testified that he observed no evidence of threats, force or coercion when he witnessed the execution of the documents; therefore, any testimony by Ms. Wilson in that regard would have been cumulative.
>
> Moreover, Defendant states under oath in his motion that his co-defendant, not the victim, invited him on the trip to Pensacola. Therefore, counsel was not ineffective for failing to call a witness whose testimony would be contradictory to defendant's sworn assertion.

(Ex. Y, p. 29) (footnotes omitted). The state court's findings are presumed correct. Petitioner offers no evidence to rebut these findings; rather, he rests on the same allegations contained in his motion for post-conviction relief. Indeed, the trial transcript reveals that when petitioner was asked on direct examination who witnessed the execution of the power of attorney and lease, he indicated Roger Williams and William Capa. (Ex. H, pp. 960-62). Neither petitioner nor any other trial witness indicated that Ms. Wilson was present at, or witnessed, the event. Furthermore, Mr. Williams testified that Mr. Saulnier voluntarily signed the documents and was not under any duress, threat of physical force, or influence of narcotics or alcohol. (*Id.*, pp. 905-06, 922-23). Accordingly, Ms. Wilson's testimony concerning witnessing the documents would have been contrary to petitioner's trial

testimony and cumulative. Based on the record before this court, it was neither contrary to nor an unreasonable application of *Strickland* for the state court to conclude that counsel's failure to call Ms. Wilson to testify concerning execution of the lease and power of attorney did not constitute ineffective assistance of counsel. *See e.g., Adams v. Balkcom*, 688 F.2d 734, 741 (11th Cir. 1982) (Defense counsel's failure to obtain independent chemical analysis of certain evidence in murder prosecution and his reliance on state lab results did not constitute denial of effective assistance, where evidence of an independent analysis would have been cumulative at best); *Anthony v. Singletary*, 839 F.Supp. 844, 847 (M.D. Fla. 1993) ("Calling additional witnesses to testify to the same acts would have been cumulative. Therefore, counsel's actions did not constitute ineffective assistance of counsel."); *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984) (Counsel was not ineffective for failing to interview defense witnesses, where their testimony would have been cumulative of that presented by witnesses who testified at trial).

Furthermore, petitioner has not rebutted the state court's finding that Ms. Wilson's proposed testimony concerning who invited petitioner on the trip to Pensacola contradicted petitioner's own statements in his verified Rule 3.850 motion. Petitioner avers Ms. Wilson would testify that she heard Mr. Saulnier invite petitioner. However, in his Rule 3.850 motion petitioner stated under oath, "The Movant, was invited by an acquaint[a]nce to accompany her (co-defendant) to Pensacola, Fl. because she did not know the area and she did not want to travel back alone after they dropped off the victim." (Ex. Y, p. 15).[7] Based on the record before the state court, it was neither contrary to, nor an objectively unreasonable application of *Strickland* for the state court to conclude that counsel's failure to call Ms. Wilson did not constitute deficient performance.

---

[7]Furthermore, petitioner's allegation that Ms. Wilson overheard a discussion about the trip to Pensacola because that discussion occurred while she was witnessing the execution of the documents, is contrary to petitioner's trial testimony. Petitioner testified that the conversation concerning the trip to Pensacola occurred while the documents were being executed. (Ex. H, p. 958-59). He also testified that the reason Mr. Williams and Mr. Capa were asked to witness the documents is because they were the only people present when the documents were executed (besides petitioner, Mr. Saulnier, co-defendant Rosario, and Rosario's companion "Omigo"). (*Id*., pp. 960-62). Thus, an alternative basis for rejecting petitioner's contention is that it conflicts with petitioner's trial testimony.

Accordingly, it is respectfully RECOMMENDED:

That the petition for writ of habeas corpus (doc. 1) challenging the convictions and sentences in *State of Florida v. Lomax Salter*, in the Circuit Court of Escambia County, Florida, case number 98-325, be DENIED and the clerk be directed to close the file.

At Pensacola, Florida this 23rd day of May, 2005.


/s/ *Miles Davis*
**MILES DAVIS
UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof. A copy of any objections shall be served upon all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**