## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**LOMAX SALTER,**
      **Petitioner,**

**v.**                         **Case No.  3:04cv426/MCR/MD**

**JAMES R. MCDONOUGH,**
      **Respondent.**

_____

## SECOND REPORT AND RECOMMENDATION

**This cause is before the court upon remand from the United States Court of Appeals for the Eleventh Circuit.  (Doc. 38).[1]  The matter is referred to the undersigned magistrate judge for a second report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  (Doc. 40).  On June 30, 2006 this court advised the parties that in preparing a second report and recommendation, the undersigned would not only address the insufficient evidence issue, but also look anew at the other issue upon which petitioner was granted a certificate of appealabilty.  (Doc. 41).  The parties were given an opportunity to supplement their previous submissions pertaining to those issues.  In response, both parties filed supplemental materials.  (Docs. 42 & 44).  After careful consideration of the issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments**

---

[1]**The Eleventh Circuit remanded the case "because the district court failed to address all of Salter's issues."  (Doc. 38, Opinion at p. 5).  This court construed the second ground of petitioner's habeas corpus petition as asserting one claim:  that trial counsel was constitutionally ineffective for failing to move for a judgment of acquittal.  (Doc. 1, p. 4, 4-4).  The Eleventh Circuit construed the second ground as raising not only that claim, but also one that the evidence was insufficient to sustain petitioner's convictions beyond a reasonable doubt under *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979).**

before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.

## BACKGROUND[2]

On December 23, 1997 Rick Carnley left his house around 5:00 a.m. and drove down Whirlpool Road in northern Escambia County.  (Doc. 9, Ex. E, p. 234).[3]  While driving down Whirlpool Road, he noticed a small fire.  (*Id.*, p. 236).  Two to three hours later William Andrews, who worked for a logging company in that area, saw the same fire while driving down Whirlpool Road.  (Ex. D, pp. 184-85).  As he approached the fire he realized that it was a human body on fire.  Andrews called the sheriff's department and threw dirt on the fire in an attempt to put out the flames. (*Id.*, pp. 186-87).

Deputy Frank Way investigated the call.  (*Id.*, pp. 170-71).  He arrived at 8:18 a.m.  (*Id.*, p. 178).  The body, in a ditch, was still smoking when he arrived.  (*Id.*, p. 172).  Way noted vehicle tracks and an area where someone had tried to obscure the tracks with a "blunt-nose shovel."  (*Id.*, pp. 173-74).  Other deputies responded to the scene.  Detective David Carroll smelled what he believed to be an odor of gasoline on the body.  (Ex. E, p. 201).  He also found a yellow piece of paper near the body. The paper had an address written on it.  (*Id.*, pp. 204-05).  Deputy Dan Henry testified that when he got close to the body he, too, detected a strong gasoline odor coming from the body.  (*Id.*, p. 327).  There were tire tracks leading to and from the body. (*Id.*).  The yellow note found near the body had the address of "3645 14th Avenue South" written on it.  (*Id.*, pp. 328-29).  A nationwide check came up with four possibilities, one of them in St. Petersburg, Florida.  (*Id.*, p. 329).

---

[2]The facts stated herein are a greatly compacted version of those presented at trial.  The facts are viewed in the light most favorable to the prosecution.  Where there are conflicting inferences and disputes exist, this court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Martin v. State of Alabama*, 730 F.2d 721,724 (11th Cir. 1984).

[3]Hereafter all references to exhibits will be to those provided at Doc. 9 unless otherwise noted.

Just prior to 4:00 a.m. on the day the body was found, Charles Smith, the night manager at a nearby Wal-Mart, was standing outside the store.  He saw a van pull up, drive past empty parking spaces near the front of the store, and park in the back of the parking lot, much farther from the front of the store than necessary.  (*Id.*, pp. 241-42).  A black male and a white female exited the van and walked into the store.  The black male asked Smith where the shovels were.  Smith later saw the couple checking out with a shovel and a red gas can.  (*Id.*, pp. 242-44).

Hilda Huffman, a Wal-Mart employee, was stocking shelves in the early morning hours of December 23, 1997.  (*Id.*, p. 261).  Petitioner and a white female walked down Huffman's aisle.[4]  As they passed, she heard the woman say to petitioner, "now we're obligated" or words to that effect.  (*Id.*, pp. 261-62).

Teresa Wilson, a Wal-Mart clerk working near the front of the store that morning, noticed a black male and a white female approach the cash registers at the front of the store.  The white female approached Ms. Wilson and asked her if the store had any shovels.  Ms. Wilson escorted the woman to the garden department.  The woman picked out a square ended shovel, commented that she did not think it would suit the purpose for which "they" wanted it, and told Ms. Wilson that if "they" decided the shovel would not work she would leave it at the register.  (*Id.*, pp. 271-75).

Lisa Grimes was working as a Wal-Mart cashier during the early morning hours of December 23, 1997.  Shortly after 4:00 a.m., petitioner and a white female arrived at her register with a gas can.[5]  (*Id.*, pp. 279-80, 283).  The gas can scanned at the wrong price, so Ms. Grimes went to the next register to call for a price check.  When she returned, the woman was gone.  Petitioner told Ms. Grimes that the woman went back to get a shovel.  The woman returned with a shovel.  Ms. Grimes rang up the shovel and gas can.  Both petitioner and the woman paid for the purchase.  Grimes overheard the woman urge petitioner "to come on, hurry up, let's go get this over with."  (*Id.*, pp. 278-82).  Grimes observed the couple leave the store

---

[4]Huffman identified petitioner in open court.  (*Id.*, p. 262).

[5]Grimes identified petitioner in open court.  (*Id.*, pp. 278-79).

and enter a van.  The van was parked at the other end of the Wal-Mart parking lot and was the only vehicle there.  Ms. Grimes did not see anyone else around the vehicle or any other cars around the van.  (*Id.*, pp. 282-83).  After reading a newspaper story about the discovery of the burned body, Grimes called police.  (*Id.*, pp. 283-84).

Still photos from the Wal-Mart surveillance video camera were entered into evidence.  (*Id.*, pp. 305-06).

Further investigation by the sheriff's department led to a Nugget Oil gasoline station.  Steven Rollo was the night manager of the station in December of 1997. (*Id.*, p. 307).  One morning Rollo observed a black male pump gas into a red gas can. A white female went inside the station and paid for the gas.  (*Id.*, pp. 307-09).  A store receipt for the morning of December 23, 1997 documented this purchase, and was admitted into evidence.  In addition, the store video tape of that morning was played for the jury, and photographs from the video tape admitted into evidence.  (*Id.*, pp. 310-312).

Investigators publicized still photographs from the Wal-Mart video camera to get an identification of the man and woman appearing on them.  (*Id.*, pp. 329-30). John Bates, a deputy sheriff, recognized the man in the photographs as his ex-brother-in-law, Lomax Salter.  (*Id.*, p. 331).  Detectives Dan Henry and Ricky Shelby spoke to petitioner's ex-wife, who advised them petitioner was living in St. Petersburg, Florida.  (*Id.*).  At that time, the detectives were able to get a possible first name of the white female seen with petitioner, the name being Lydia.  (*Id.*, p. 332).  After more research the detectives were able to come up with a current address and possible last name on Lydia.  The possible last name was Rosario. (*Id.*).

Henry and Shelby traveled to St. Petersburg and met with Detective Deasaro with the St. Petersburg Police Department .  The three went to the address identified on the note found near the body.  (*Id.*, p. 333).  A woman there knew petitioner vaguely.  (*Id.* p. 334).  She indicated petitioner lived approximately a mile away.  (*Id.*).

The next day, Detectives Henry and Shelby went to petitioner's home. Petitioner answered the door, stated that Lomax Salter wasn't there, and furnished

a false name.  (*Id.*, pp. 336-37).  Petitioner later admitted he was Lomax Salter and accompanied the detectives to the St. Petersburg Police Department for an interview.  (*Id.*, p. 337).  During the interview, petitioner indicated he knew Lydia Rosario and that their relationship was "strictly employment."  (*Id.*, pp. 339-40).  He admitted to being in Pensacola, Florida just before Christmas and to buying a shovel and gas can at the Wal-Mart.  (*Id.*, pp. 340-41).

Later, the detectives located Lydia Rosario driving a 1994 or 1995 Ford Van, which appeared to be the same van as in the Nugget Oil videotape.  The van bore a tag registered to Louis Saulnier.  (*Id.*, pp. 347-48).

The detectives went to Saulnier's home where they found a telephone caller I.D. unit with a number which corresponded to petitioner's ministry Breaking Point Ministries.  (*Id.*, p. 350).  Officers also found Saulnier's bank records indicating his account was overdrawn.  Also found at Saulnier's home was "a last will and testament kit," a durable power of attorney, and a residential lease, the notary for which was petitioner.  The execution date of the power of attorney was December 22, 1997.  (*Id.*, pp. 351, 354-58).  The person named as being the tenant in the lease, and as holding Mr. Saulnier's power of attorney, was Lydia Rosario.  (Ex. G, pp. 611, 612, 788).  Also found at Saulnier's home were additional blank durable power of attorney forms which petitioner had notarized.  (Ex. E, pp. 356-58).

After checking Saulnier's home, the detectives attempted to identify the burned body by showing the photographs of the body to Troy Saulnier, Louis Saulnier's nephew who was a deputy with the Hillsborough County Sheriff's Department.  Troy Saulnier identified the burned body as that of his uncle, Louis Saulnier.  (*Id.*, p. 352).

The pathologist could not ascertain an exact cause of death; however, he was of the opinion that it was a homicide because he could find no natural cause of death.  (Ex. F, p. 429).  The pathologist was of the opinion that the victim was already dead at the time he was set on fire.  (*Id.*, p. 430).

An official of Louis Saulnier's bank testified concerning bank records which showed that on average, Saulnier's checking, savings, and certificate of deposit

accounts averaged a total of $40,000 up through November of 1997. (*Id.*, p. 523). On November 18, 1997, a $15,000 check was drawn. (*Id.*, pp. 523-24). On December 30, 1997, Lydia Rosario withdrew $10,000 from Saulnier's savings account using a power of attorney. (*Id.*, p. 524). The power of attorney was dated December 30, 1997 and was notarized by petitioner. (*Id.*, p. 525). From December 30, 1997 to January 6, 1998, Lydia Rosario withdrew $14,989.94 out of Saulnier's accounts. (*Id.*, p. 529). Bank videotapes were also introduced into evidence. (*Id.*, pp. 531-32).

A relative of Louis Saulnier found a receipt from one of Saulnier's checks. The check was dated December 22, 1997 and made out to Breaking Point Ministries for $1,385. (*Id.*, p. 538). Louis Saulnier's sister testified that it was greatly out of character for Saulnier to contribute to religious organizations. In fact, Saulnier had separated from his late wife for one year because she "had been involved in religious television, and he wasn't happy." (*Id.*, pp. 473-74).

Lydia Rosario (petitioner's co-defendant) applied to a social services agency for rent help in December of 1997. (*Id.*, p. 591). On one of the forms, she listed her address as Breaking Point Ministries located at 3620 18th Avenue South, indicating that that had been her address since January 6, 1997. The form was signed by Reverend L.M. Salter, who gave the same address as his own. (*Id.*, p. 592). The same social services agency received a request for rent help from petitioner in November and December of 1997. To be eligible, petitioner had to sign a form stating that he had no income and no assets. (*Id.*, p. 593).

A handwriting examiner testified that the address on the note found at the crime scene "was probably written by Mr. Salter." (Ex. G, pp. 624-25).

Police obtained an additional statement from petitioner, part of which was recorded. In the unrecorded portion of the statement, petitioner told police, among other things, that he was "holding" some $10,000 from a $20,000 "settlement" Rosario had received, and that he "still owed her some $6,000 from that money he had been holding for her." (*Id.*, p. 658). Petitioner also admitted getting cash from Lydia Rosario. (*Id.*, p. 663). Police found on petitioner two new, fresh $50 bills. When Lydia Rosario was investigated by police, she had "several thousand dollars'

worth in 50s" with virtually sequential serial numbers.  (*Id.*, pp. 663-64).  The recorded portion of petitioner's statement was played for the jury.  (*Id.*, pp. 727, 790).  In that statement, petitioner admitted being at the scene where Saulnier was killed and burned, admitted notarizing documents purportedly signed by Saulnier for the benefit of Rosario after Saulnier's death, admitted being the man in the video at Wal-Mart and Nugget Oil, but denied personal culpability in the death of Saulnier, claiming that Lydia Rosario and two Hispanic males named Glenn and "Dwayne or Wayne" were responsible.  (*Id.*).

After Louis Saulnier disappeared, his relatives went searching for a gray Ford car of his that was missing, believing it to be stolen.  (Ex. F, pp. 490-91).  They later found it in a St. Petersburg store parking lot with a "For Sale" sign listing a telephone number of 804-1253.  (*Id.*, p. 492).  Police found in petitioner's wallet a piece of paper with the writing "L.D., then 804-1253."  (Ex. G, p. 685).

## PROCEDURAL HISTORY

On January 21, 2000 petitioner was found guilty by jury verdict of first degree premeditated or felony murder (Count 1), kidnapping (Count 2), and robbery (Count 3), in the Circuit Court of Escambia County, Florida, case number 98-325.  (Doc. 9, Ex. A, pp. 407-14).  This was petitioner's second trial, his first trial having ended in a mistrial.  (*See* www.clerk.co.escambia.fl.us, case number 98-325, docket entry of 6/11/99).  Petitioner was sentenced to concurrent terms of life imprisonment on Count 1, twenty years imprisonment on Count 2 and fifteen years imprisonment on Count 3.  (Ex. A, pp. 407-14).  On appeal, petitioner's appellate counsel filed an *Anders*[6] brief.  (Exs. M & O).  Although petitioner sought and was granted permission to file his own *pro se* initial brief, (ex. Q), he ultimately filed a notice stating that he declined to file a brief.  (Ex. T).  The Florida First District Court of Appeal ("First DCA") affirmed petitioner's convictions and sentences on July 5, 2002, without written opinion.  *Salter v. State*, 826 So.2d 290 (Fla. 1st Dist. Ct. App. 2002) (Table).

On January 29, 2003 petitioner filed a motion for post-conviction relief

---

[6]*Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

pursuant to FLA.R.CRIM.P. 3.850. (Ex. Y, pp. 1-26). The Rule 3.850 court denied relief in an order dated November 12, 2003. (*Id.*, pp. 27-29). The denial order was affirmed by the First DCA without written opinion on March 29, 2004, *Salter v. State*, 871 So.2d 214 (Fla. 1st DCA 2004) (Table), with the mandate issuing April 26, 2004. (Ex. CC).

Petitioner filed the instant federal habeas petition on November 29, 2004. (Doc. 1).

## DISCUSSION

### Standard of Review

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas

corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523 (O'Connor, J., concurring).  Under the test just described a habeas court does not examine the State court's ruling to see if it is correct, but examines it only to see if it is reasonable.  More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id.*, 123 S.Ct. 1172.   The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  *Neelley v.* Nagle, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer,* 123 S.Ct. at 1173 (quoting *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. at 1519-20).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases--indeed, it does not even require awareness of our cases, so

long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  *Holland v. Jackson*, 542 U.S. 647, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued.  *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not

grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*, 529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims.  *Neelley*, 138 F.3d 917.  Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication  "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that:  "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that

the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court).

_____Within this framework, the court will review petitioner's claims.

Petitioner's Claims

> Ground 1.    Ineffective assistance of counsel - permitting prior testimony of jail-house informant to be read into evidence when witness was available to testify.

Petitioner claims he was denied effective assistance of trial counsel when counsel failed to "properly" object to the State's use of Witness Twanna Banning's prior trial testimony and, when that objection was overruled, allowed the prior testimony to be read to the jury (as opposed to requiring Ms. Banning to testify live). Respondent asserts this claim is procedurally defaulted.

_____Petitioner raised this claim in his Rule 3.850 motion.  The Rule 3.850 court denied relief as follows:

> Defendant's first asserted claim for relief is that his counsel was ineffective for permitting the prior testimony of a witness from Defendant's first trial to be read to the jury as rebuttal by the State. Defendant contends such testimony was double hearsay and not an exception to the hearsay rules under Section 90.804(2)(a), Fla. Stat. Defendant contends counsel should have kept such evidence from being presented to the jury.

> The record reflects that counsel objected to the reading of Twanna Banning's prior testimony to the jury.  The Court overruled the objection.  Defendant fails to explain how counsel could have kept the testimony from being read to the jury in the face of an unsuccessful objection.

> The bulk of Defendant's argument on claim one regards the admissibility of the read testimony to which counsel objected.  It is clear that Defendant is seeking a second appeal of an issue which should have been raised on direct appeal by restyling it as "ineffective assistance of counsel."   Therefore, Defendant's first claim is not properly before the court.

(Ex. Y, pp. 27-28) (emphasis added) (footnote omitted).  The First DCA affirmed the denial order without written opinion.

Respondent contends that the state court's explicit finding of procedural bar precludes federal habeas review of this claim. (Doc. 44, p. 4).  A state court decision

based on state law grounds that are independent of federal law and adequate to support the judgment creates a procedural default barring federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 2554, 115 L. Ed. 2d 640 (1991). The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," that is, not applied in an "arbitrary or unprecedented fashion," or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, a petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991). "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower v. Phillips, supra.* To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

This court must first decide whether the Rule 3.850 court's imposition of a procedural bar was adequate to support the judgment. In *Cherry v. State*, 659 So.2d

1069 (Fla. 1995), the Florida Supreme Court reiterated the well established and consistently applied doctrine under Florida law that claims that could have been raised on direct appeal but were not, are procedurally barred from collateral review, and couching such claims in terms of ineffective assistance of counsel for failure to preserve or raise them cannot be used to circumvent that rule. *Id.*, at 1072. However, at least two Florida appellate courts have held that the rule stated in *Cherry* does not apply to certain ineffective-assistance claims. In *Knight v. State*, 710 So.2d 648 (Fla. 2nd Dist. Ct. App.), the court explained:

> [The] principles [of *Cherry*] do not apply to a claim where a specific accusation is aimed at trial counsel -- be it the failure to move to suppress evidence, the failure to object to the admission of evidence, or, as here, silence in the face of an objectionable comment by the prosecutor -- which has not, and could not have, been raised on plenary appeal. There is a critical distinction between an attack on counsel for failing to object to, and thus preserve review of, a prosecutor's remark and the reviewability by an appellate court of the comment itself to determine whether reversal is warranted. *See, e.g., Wells v. State*, 598 So.2d 259 (Fla. 1st Dist. Ct. App. 1992) (condemning a trial court order denying a postconviction claim on the basis that the sentence should have been challenged on direct appeal while overlooking that the claim was based upon trial counsel's failure to object to the sentencing procedure, thus barring direct review).
>
>  We observe a troubling tendency by trial courts in this district, principally in the two most populous counties, to deny procedurally legitimate attacks on trial counsel by relying on the prisoner's failure to raise the underlying, substantive issue on direct appeal when the prisoner has claimed he was prohibited from doing so only because of the very deficiency of counsel in failing to pose the appropriate legal objection.

*Id.*, at 649.

 In the instant case, counsel objected to the State's use of the Banning testimony in rebuttal. The trial court overruled the objection. Counsel renewed his objection, thereby preserving it for appeal. On appeal, petitioner's counsel filed an *Anders* brief, but identified the admission of the Banning testimony as an issue that was not arguably reversible error, but one that presented an interesting legal question of when the prior, unsworn statements of a hearsay declarant can be impeached by other prior, unsworn statements of the hearsay declarant. Counsel

phrased the issue as follows: "Did the trial court abuse its discretion by allowing in rebuttal hearsay testimony attributed by others to Lydia Rosario as prior statements inconsistent with other statements attributed to Lydia Rosario by defense witnesses?" (Ex. O, pp. 12-14). The appellate court reviewed this and other issues mentioned in the *Anders* brief and declined to appoint petitioner counsel to file an adversarial brief, implicitly finding that even this issue was frivolous. Petitioner was given the opportunity to file a *pro se* brief, but he declined. (Exs. Q-T). This is not a case where petitioner was precluded from seeking plenary review of the trial court's evidentiary ruling on the Banning testimony due to trial counsel's deficiency. In his Rule 3.850 motion, petitioner conceded that trial counsel objected to the State's use of the testimony and that the objection was overruled. In an attempt to overcome his abandonment of the underlying issue on direct appeal, petitioner's Rule 3.850 motion re-styled the claim as an ineffective assistance claim based on counsel's failure to object "insistently," and for counsel's objection being "poor." (Ex. Y, p. 7). As the Rule 3.850 determined, petitioner was, in fact, attempting to raise an issue that could have been raised on direct appeal but was not, by restyling it as an ineffective assistance claim. The Rule 3.850 court's application of a procedural bar to this aspect of petitioner's claim was consistent with *Cherry*, and adequate to support the judgment. Therefore, this court should consider it procedurally defaulted. Petitioner has made none of the requisite showings to excuse his default. Therefore, this court should not review it.

Even if the court reviewed this aspect of petitioner's ineffective assistance claim, petitioner is not entitled to habeas relief. The Rule 3.850 court did address the merits of petitioner's IAC claim based on counsel's failure to "properly" object to the Banning testimony, concluding that counsel properly objected, and that petitioner failed to show what more counsel could have done to keep the jury from hearing the substance of Banning's testimony. This was neither contrary to, nor an unreasonable application of clearly established federal law.

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*). In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance. *Chandler* at 1314. "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*, 513 U.S. 899, 115 S.Ct. 255, 130 L.Ed.2d 175 (1994). In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance." *Waters* [*v. Thomas*, 46 F.3d 1506], 1522 (en banc). Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness. *Chandler* at 1314 (footnote omitted). Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment.

*Chandler* at 1314 n.15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. at 2068. Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not

sufficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

During the defense case, two witnesses testified concerning statements co-defendant Lydia Rosario made to them which related details of the crimes. Kelly Ostroski testified that Rosario told her two Mexican males took the trip with Rosario and petitioner to Pensacola; that the victim Louis Saulnier was afraid of Rosario; and that petitioner was not present when the two Mexicans were "involved" with the victim. (Ex. H, pp. 860-63). Ms. Ostroski also testified that Rosario told her petitioner was not involved with the plan to kill Mr. Saulnier, he (petitioner) just notarized the power of attorney. (*Id.*, p. 869). Meghan Hartrick testified through the reading of her previous trial testimony that co-defendnat Rosario told her if people hadn't come down the road, petitioner would have been killed. Hartrick also testified that Rosario did not say anything indicating petitioner was involved in the planning or commission of the Saulnier murder. (*Id.*, p. 884).

At the close of the defense case, the State identified its rebuttal witnesses, including Twanna Banning, proffering that Ms. Banning would testify to statements Rosario made to her while at the Escambia County Jail. (Ex. I, p. 1036). Defense counsel objected to the Banning testimony, arguing that it was not proper rebuttal in that it did not rebut any defense witness' testimony. (*Id.*). The State argued that the testimony was proper rebuttal because the statements Rosario made to Banning told "a different story" than the statements Rosario made to the defense witnesses. (*Id.*, pp. 1036-37). The trial court overruled the defense objection. (*Id.*, p. 1037). The State then suggested that it might be quicker and easier to read Ms. Banning's prior

trial  testimony[7] into the record instead of having her testify live from the stand.  (*Id.*, pp. 1037, 1075).  Defense counsel agreed.  (*Id.*, pp. 1075, 1078).  Defense counsel and the prosecutor began to read into the record the prior trial testimony of Twanna Banning, with defense counsel reading the questions he posed in his prior direct examination of Ms. Banning, and the prosecutor reading Ms. Banning's answers. (*Id.*, p. 1077).  Shortly after commencing the reading, defense counsel renewed his objection to the admission of the testimony, and the court again overruled it.  (*Id.*, p. 1078).  At a bench conference, defense counsel clarified that his objection was that the testimony was not proper rebuttal.  (*Id.*).  The court reiterated that the objection was overruled, noting "[i]t comes in principally as a -- as a prior inconsistent statement to the other statements attributed to Lydia Rosario."  (*Id.*). Defense counsel argued in opposition that if that was the case, the court should limit the Banning testimony to only those statements which contradicted the prior statements attributed to Rosario.  (*Id.*).  In response the State explained that Rosario's statements, as related by Twanna Banning, were admissible as "statement[s] against penal interest," an exception to the hearsay rule.  (*Id.*, pp. 1078-79).  The trial court ruled that the statements had "dual functions," but that they principally constituted rebuttal because they were offered as prior inconsistent statements.  (*Id.*, p. 1079).[8]  Defense counsel and the prosecutor resumed their reading of Banning's prior trial testimony into the record.  The prior trial testimony included defense counsel's direct examination, the State's cross-examination, defense counsel's re-direct, and the State's re-cross.  (*Id.*, pp. 1079-88).

---

[7]Ms. Banning testified at petitioner's first trial.

[8]Florida Rule of Evidence 90.806 provides, in pertinent part, as follows:

Attacking and supporting credibility of declarant
   (1) When a hearsay statement has been admitted in evidence, credibility of the declarant may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time inconsistent with the declarant's hearsay statement is admissible, regardless of whether or not the declarant has been afforded an opportunity to deny or explain it.

Fla. Stat. § 90.806; *see also* Fla.Stat. §§ 90.608 and 90.614.
*Case No: 3:04cv426/MCR/MD*

The substance of the read testimony was as follows.  Banning testified that Rosario told her there was a plan to kill petitioner, but it was only so that Rosario would not have to split the money with him.  (*Id.*, pp. 1080-81).  Banning further testified that, in terms of discussing the murder of Saulnier, Rosario always used the term "we" and referred both to petitioner and her husband Juan.  (*Id.*, p. 1081).  On cross-examination (via transcript), Banning testified that Rosario told her that at one point during the trip Mr. Saulnier started to re-gain consciousness, so she (Rosario) and petitioner stopped at a pawn shop and purchased a pair of handcuffs.  (*Id.*, p. 1082).  Rosario and petitioner used those handcuffs and a stun gun to immobilize Saulnier.  (*Id.*, pp. 1082-84).  When Rosario talked about the incident, the only people identified as being in the van were herself, Saulnier and petitioner.  (*Id.*, p. 1083).  Rosario also told Banning that "they" stopped and bought a shovel at Wal-Mart; that "they" beat Saulnier with it, poured gasoline on him and set him on fire; that "they" had planned the murder in advance for some length of time; that the motive was to get Saulnier's money; and that the use of the stun gun and handcuffs occurred in the van.  (*Id.*, pp. 1082-84).  On defense counsel's re-direct of Ms. Banning at the prior trial, defense counsel emphasized through his questioning that when Rosario was describing events to Banning, she often used the term "we," and that Rosario's husband accompanied Rosario, petitioner and Saulnier on the trip from St. Petersburg to Pensacola, but drove in a separate vehicle which followed the van.  (*Id.*, pp. 1084-86).  The State then re-crossed.  (*Id.*, pp. 1087-88).

Petitioner concedes that trial counsel objected to admission of the Banning testimony on the grounds of improper rebuttal, but argues that counsel erred because that was not the proper objection.  According to petitioner, trial counsel should have objected on the following grounds: (1) the statements of co-defendnat Rosario to which Banning testified did not qualify as prior inconsistent statements because they were not contrary to Rosario's prior statements, (2) the statements of co-defendnat Rosario to which Banning testified were not statements against penal interest because "it would comport with the law," (3) the Banning testimony was inadmissible because co-defendant Rosario pleaded the Fifth Amendment and

therefore could not be cross-examined, and (4) the Banning testimony was inadmissible double hearsay.  (Doc. 1, p. 4-3).

As just described, the trial transcript conclusively demonstrates that trial counsel's objection and corresponding argument concerning the substance of Banning's testimony encompassed the hearsay issue, as did the trial court's evidentiary ruling.[9]  Thus, petitioner's contention that counsel failed to attempt to exclude or limit the Banning testimony on hearsay grounds is refuted by the record. Moreover, in light of the portions of the trial transcript just discussed, petitioner's allegations fail to establish a reasonable probability that had counsel further pursued a hearsay objection on the specific points raised by petitioner, the trial court would have excluded the Banning testimony on hearsay grounds.

As to the other aspect of petitioner's ineffective assistance claim -- counsel's alleged deficiency in failing to require the State to produce Ms. Banning (*i.e.*, counsel stipulating that Ms. Banning's prior trial testimony could be read into the record instead of Ms. Banning testifying live) -- under the clarification in subsequent Florida law, it appears that the state court's application of a procedural bar to this aspect of petitioner's claim did not rest on adequate state grounds.  *See, e.g., Smith v. Crosby*, 159 Fed.Appx. 76, 78-79 (11th Cir. Dec. 2, 2005) (holding that Florida post-conviction court's procedural default ruling did not rest on adequate state grounds to present procedural bar to habeas review of claim that counsel was ineffective in failing to object to prosecutor's comments; petitioner's claim came under one of the exceptions recognized in *Knight, supra*).[10]  Thus, this court is not precluded from reviewing the merits of this aspect of the ineffective assistance claim.  Further, because it does not appear that the Rule 3.850 court adjudicated the merits of this aspect of the claim, the court will review it *de novo*.

_____

[9]To the extent petitioner argues the trial court's ruling was error because the hearsay statements contained in the Banning testimony did not qualify as prior inconsistent statements or statements against penal interest, such a claim is procedurally defaulted because petitioner failed to pursue it on direct appeal when he had the opportunity.

[10]The undersigned cites *Smith v. Crosby* only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* 11th Cir. R. 36-2.

As previously indicated and as respondent concedes (doc. 44, p. 9), defense counsel agreed that Ms. Banning's testimony would be presented by reading the transcript of her prior trial testimony, instead of her testifying live.  (Ex. I, p. 1075).  Petitioner contends counsel's stipulation constitutes deficient performance because it "was not strategically or tactically done."  (*Id.*, p. 4-2).  He argues that such error was prejudicial because "cross-examination of a witness in [sic] an invaluable right that stems from the constitutional right of an accused to be confronted by the accusers," (*id.*, p. 4-2; doc 11, pp. 2-3), and because "the probability exists that cross-examination could have changed the outcome of the verdict."  (Doc. 11, p. 3).  Petitioner's conclusory allegations of prejudice are insufficient to meet the *Strickland* standard.  Defense counsel examined Ms. Banning at the first trial, not only on direct but also on re-direct after the State cross-examined her.  Regardless of defense counsel's questioning, Ms. Banning's testimony was, to use petitioner's words, "very damaging to the defense."[11]  Petitioner has made no showing whatsoever that there is a reasonable probability that the result of his trial would have been different had Banning testified live and defense counsel cross-examined her.  *See, e.g., Schwab v. Crosby*, 451 F.3d 1308, 1321-22 (11th Cir. 2006) (holding that petitioner was not entitled to habeas relief on ineffective assistance claim based on defense counsel's failure to attempt any cross-examination of five of the State's witnesses, where petitioner made no showing that there was a reasonable probability of a different result in the trial if counsel had cross-examined some or all of the five witnesses); *Fugate v. Head*, 261 F.3d 1206, 1219-20 (11th Cir. 2001) ("Absent a showing of 'a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial,' the petitioner is unable to show prejudice necessary to satisfy the second prong of *Strickland*.") (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985))).  Thus,

---

[11]*See* Doc. 1, p. 4-1.

even reviewing this aspect of petitioner's ineffective assistance claim *de novo*, petitioner is not entitled to habeas relief under *Strickland*.[12]

> **Ground 2.** **Ineffective assistance of counsel - failure to move for judgment of acquittal at the close of the evidence. Insufficient direct evidence of guilt to sustain petitioner's conviction.**

Petitioner next claims that his trial counsel rendered ineffective assistance because he failed to move for a judgment of acquittal at the close of evidence. Petitioner argues that counsel knew the State had not proven by direct evidence the elements of the crimes with which he was charged; therefore, he should have filed a motion for judgment of acquittal which included argument on Florida's circumstantial evidence rule.

> **Ground 2-A** **Ineffective assistance of counsel - failure to move for judgment of acquittal at the close of the evidence.**

> **i.** **Clearly established federal law**

The clearly established federal law governing ineffective assistance claims is set forth in Ground 1, above.

> **ii.** **Review of state court decision**

The Rule 3.850 court denied relief, finding as follows:

> **The record reflects that counsel did, in fact, renew his motion for judgment of acquittal after resting Defendant's case. Counsel renewed his motion on identical grounds stated at the close of the State's case, which were detailed, specific and legally sufficient. Counsel specifically noted the different standard of review for this motion for judgment of acquittal, and the Court denied the motion. Therefore, Defendant's claim is without merit.**

---

[12]In the supplement to his answer (doc. 44), respondent notes that in the briefing before the Eleventh Circuit, petitioner "insinuated" that there was a *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) issue in this case and attempted to argue that *Crawford* applied retroactively to the instant case. In *Crawford*, the Supreme Court held that no testimonial hearsay statement could be admitted at trial unless the proponent established (1) that the declarant was unavailable to testify at trial; and (2) that the defendant had a prior opportunity to cross-examine the declarant about his or her statements. *Id.*, 541 U.S. at 59, 124 S.Ct. at 1369.

Petitioner has not raised a *Crawford* issue in this court. Even if he had, the Eleventh Circuit has determined that the new procedural rule of law announced in *Crawford* does not apply retroactively to cases on collateral review. *Espy v. Massac*, 443 F.3d 1362, 1367 (11th Cir. 2006).

(Ex. Y, p. 28) (footnotes omitted).  The state court's findings are presumed correct, and are amply supported by the record.  The trial transcript reveals that defense counsel moved for judgment of acquittal at the close of the State's case in chief. (Ex., H, p. 818).  He then renewed the motion after resting the defense's case, (Ex. I, p. 1074), and again at the close of all the evidence, (Ex. J, p. 1274).  Petitioner has failed to show by clear and convincing evidence that the state court's factual findings were incorrect or that its legal determinations were unreasonable or contrary to federal law.  *See*  § 2254(d)(1).  Therefore, petitioner is not entitled to federal habeas relief on this ground.

### Ground 2-B.          Insufficient Evidence

In this court's initial denial of habeas relief, it did not construe petitioner's second claim as asserting an independent constitutional claim of insufficient evidence.  (*See* Docs. 13, 15).  Rather, it read petitioner's claim as asserting ineffective assistance of counsel for failure to move for judgment of acquittal ("JOA"), with petitioner attempting to establish prejudice by arguing that had a motion for JOA been made it would have been granted because the evidence was insufficient to convict.  The Eleventh Circuit disagreed.  (Doc. 38).  That court construed petitioner's habeas petition as alleging "inter alia . . . that the evidence was insufficient to sustain his conviction beyond a reasonable doubt under *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979)" and, finding that this court failed to address that issue, remanded the matter for further proceedings.  (*Id.*) (footnote omitted).

### i.     Clearly established federal law

As an issue of federal law, petitioner's insufficient evidence claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict, *i.e.* the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.  *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).  When reviewing a claim of insufficient evidence in federal habeas corpus, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but "whether, after

viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789 (citation omitted); *see also Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir. 1990).

Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. *Wilcox*, 813 F.2d at 1143; *Martin v. State of Alabama*, 730 F.2d 721,724 (11th Cir. 1984) (holding that where there are conflicting inferences and disputes exist, this court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution). Moreover, the evidence need not rule out every theory except that which signifies guilt beyond a reasonable doubt; "[t]he simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." *Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987); *accord, Carter v. Montgomery*, 769 F.2d 1537, 1542 (11th Cir. 1985) (it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.).

### ii.    State court decision

The Rule 3.850 court construed petitioner's second ground for relief the same way as this court -- as asserting an ineffective assistance claim based on counsel's alleged failure to move for a judgment of acquittal. It did not read petitioner's claim as asserting an independent constitutional claim of insufficient evidence. (Ex. Y, p. 28). Accordingly, the state court adjudicated the merits only of petitioner's ineffective assistance claim, not the implied constitutional sufficiency issue. (*Id.*, *see also* doc. 38, p. 4). This court must therefore review the issue *de novo*.

### iii.    *De novo* review

The evidence in this case shows that there was a conflict at trial between the State's theory of the case, and the defense's theory. Petitioner asserts that the evidence produced by the State was circumstantial, and that there was no direct evidence "to refute the petitioner's defense as to the alleged offenses he's convicted of." (Doc. 1, pp. 4, 4-4). He further argues that "[c]ounsel in this case knew that the

State had not proven by direct evidence the elements of the crimes for which the petitioner was charged with [sic].  Counsel in his knowledge of the law should have filed a motion for judgment of acquittal.  Counsel knew that all the evidence the State presented to the jury were [sic] circumstantial, not defeating the hypothesis of innocence."  (*Id.*, p. 4-5).

From the evidence adduced in this case, as set forth in this Report and Recommendation, a rational trier of fact could have found the essential elements of murder, kidnapping and robbery beyond a reasonable doubt.  Under Florida law in effect in 1997, the elements of first degree premeditated or felony murder were, in pertinent part, as follows:

(1) the unlawful killing of a human being;

(a) when perpetrated from a premeditated design to effect the death of the person killed or any human being; or

(b) when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any robbery or kidnapping.

FLA. STAT. ch. 782.04(1)(a) (1997).  The elements of kidnapping were, in pertinent part, as follows:

(1) forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority;

(2) with intent to:

(a) commit or facilitate commission of any felony, or

(b) inflict bodily harm upon or to terrorize the victim or another person.

FLA. STAT. ch. 787.01(1)(a) (1997).  *See also Bell v. State*, 847 So.2d 558 (Fla. 3rd Dist. Ct. App. 2003).  The elements of robbery were as follows:

(1) the taking of money or other property from the person or custody of another;

(2) with intent to either permanently or temporarily deprive the person or hte owner of the money or other property; and

(3) when in the course of the taking there is the use of force, violence, assault, or putting in fear.

FLA. STAT. ch. 812.13(2)(c) (1997).  *See also Hamrick v. State*, 648 So.2d 274 (Fla. 4th Dist. Ct. App. 1995).

In the instant case, a rational jury could have found the evidence presented by the State to be credible.  That evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that: (1) petitioner unlawfully killed Louis Saulnier either from a premeditated design to effect his death or when petitioner was engaged in perpetrating a robbery or kidnapping; (2) petitioner forcibly, secretly, or by threat confined, abducted, or imprisoned Mr. Saulnier against his will and without lawful authority with the intent to commit or facilitate a felony, or to inflict bodily harm upon, or to terrorize Mr. Saulnier; and (3) petitioner, by the use of force, violence, assault, or putting in fear, took money or other property from Mr. Saulnier with intent to either permanently or temporarily deprive Mr. Saulnier of the money or other property.  The insufficient evidence argument raised by petitioner in Ground 2 does not entitle him to federal habeas relief.

Ground 3.    Ineffective assistance of counsel - failure to call Rene Wilson as a defense witness[13]

Petitioner asserts that prior to trial he advised counsel that counsel needed to contact Rene Wilson, the secretary of petitioner's ministry.   According to petitioner, Ms. Wilson witnessed the power of attorney and the residential lease prepared by petitioner and signed by Mr. Saulnier.  Petitioner states Ms. Wilson was available and would have testified that at no time in her presence was there an indication that force was used during the recording or signing of the legal instruments, nor was there any sign of sedation or drug use at the time of the recording.  Additionally, Ms. Wilson would have testified that during her witnessing of the documents, she overheard that the victim was planning a trip to Michigan but had to stop in Pensacola to pick up his friend Dwayne's car, and also overheard the victim invite petitioner to accompany him on the trip because the victim was concerned about co-defendant Rosario driving back alone from Pensacola to St.

---

[13]The following is the undersigned's analysis of this claim as set forth in the first Report and Recommendation dated May 23, 2005. (Doc. 13, pp. 16-18).  The Eleventh Circuit did not grant a certificate of appealability on this issue; therefore, the undersigned has not re-examined its prior adjudication of the claim.

Petersburg.   Petitioner contends he was prejudiced by counsel's failure to investigate and call Ms. Wilson as a witness because there is a reasonable probability that her testimony would have cast doubt in the jury's mind concerning his guilt.

### A.   Clearly established federal law

The clearly established federal law governing ineffective assistance claims is set forth in Ground 1, above.

### B.   Review of state court decision

The Rule 3.850 court denied relief, finding as follows:

> Defendant's claim cannot be reconciled with the record. Defendant testified under oath at trial that the documents were witnessed by William Capa and Roger Williams, not by Ms. Wilson.  Mr. Williams testified that he observed no evidence of threats, force or coercion when he witnessed the execution of the documents; therefore, any testimony by Ms. Wilson in that regard would have been cumulative.

> Moreover, Defendant states under oath in his motion that his co-defendant, not the victim, invited him on the trip to Pensacola. Therefore, counsel was not ineffective for failing to call a witness whose testimony would be contradictory to defendant's sworn assertion.

(Ex. Y, p. 29) (footnotes omitted).  The state court's findings are presumed correct. Petitioner offers no evidence to rebut these findings; rather, he rests on the same allegations contained in his motion for post-conviction relief.  Indeed, the trial transcript reveals that when petitioner was asked on direct examination who witnessed the execution of the power of attorney and lease, he indicated Roger Williams and William Capa.  (Ex. H, pp. 960-62).  Neither petitioner nor any other trial witness indicated that Ms. Wilson was present at, or witnessed, the event. Furthermore, Mr. Williams testified that Mr. Saulnier voluntarily signed the documents and was not under any duress, threat of physical force, or influence of narcotics or alcohol.  (*Id.*, pp. 905-06, 922-23).  Accordingly, Ms. Wilson's testimony concerning witnessing the documents would have been inconsistent with petitioner's trial testimony and cumulative. Based on the record before this court, it was neither contrary to nor an unreasonable application of *Strickland* for the state

court to conclude that counsel's failure to call Ms. Wilson to testify concerning execution of the lease and power of attorney did not constitute ineffective assistance of counsel.  *See e.g., Adams v. Balkcom*, 688 F.2d 734, 741 (11th Cir. 1982) (holding that defense counsel's failure to obtain independent chemical analysis of certain evidence in murder prosecution and his reliance on state lab results did not constitute denial of effective assistance, where evidence of an independent analysis would have been cumulative at best); *Anthony v. Singletary*, 839 F.Supp. 844, 847 (M.D. Fla. 1993) ("Calling additional witnesses to testify to the same acts would have been cumulative. Therefore, counsel's actions did not constitute ineffective assistance of counsel."); *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984) (holding that counsel was not ineffective for failing to interview defense witnesses, where their testimony would have been cumulative of that presented by witnesses who testified at trial).

Furthermore, petitioner has not rebutted the state court's finding that Ms. Wilson's proposed testimony concerning who invited petitioner on the trip to Pensacola contradicted petitioner's own statements in his verified Rule 3.850 motion.  Petitioner avers Ms. Wilson would testify that she heard Mr. Saulnier invite petitioner.  However, in his Rule 3.850 motion petitioner stated under oath, "The Movant, was invited by an acquaint[a]nce to accompany her (co-defendant) to Pensacola, Fl. because she did not know the area and she did not want to travel back alone after they dropped off the victim."  (Ex. Y, p. 15).[14]  Based on the record before the state court, it was neither contrary to, nor an objectively unreasonable application of *Strickland* for the state court to conclude that counsel's failure to call Ms. Wilson did not constitute deficient performance.

---

[14]Furthermore, petitioner's allegation that Ms. Wilson overheard a discussion about the trip to Pensacola because that discussion occurred while she was witnessing the execution of the documents, is contrary to petitioner's trial testimony.  Petitioner testified that the conversation concerning the trip to Pensacola occurred while the documents were being executed. (Ex. H, p. 958-59).  He also testified that the reason Mr. Williams and Mr. Capa were asked to witness the documents is because they were the only people present when the documents were executed (besides petitioner, Mr. Saulnier, co-defendant Rosario, and Rosario's companion "Omigo"). (*Id.*, pp. 960-62). Thus, an alternative basis for rejecting petitioner's contention is that it conflicts with petitioner's trial testimony.

Accordingly, it is respectfully RECOMMENDED:

That the petition for writ of habeas corpus (doc. 1) challenging the convictions and sentences in *State of Florida v. Lomax Salter*, in the Circuit Court of Escambia County, Florida, case number 98-325, be DENIED and the clerk be directed to close the file.

At Pensacola, Florida this 28th day of August, 2006.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).